## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

THOMAS HAYNES, JR., JUANITA )
E. HAYNES, and CAROLINE HAYNES )
PAGE on behalf of themselves and all others )
similarly situated, )
           )
       Plaintiffs, )         **Case No. 3:04-1081**
           )         **Judge Trauger**
v. )
           )
HOMEQ SERVICING CORPORATION, )
WACHOVIA CORPORATION, and )
WACHOVIA BANK OF DELAWARE, N.A., )
           )
       Defendants. )

## MEMORANDUM

This matter comes before the court on a Motion for Summary Judgment filed by the defendants (Docket No. 31), to which the plaintiffs have responded (Docket No. 47), and the defendants have replied (Docket No. 64). In addition, the plaintiffs have filed a Motion for Leave to Amend Plaintiffs' First Amended Class Action Complaint (Docket No. 45), to which the defendants have responded (Docket No. 54), and the plaintiffs have replied (Docket No. 63), and a Motion for Class Certification (Docket No. 56), to which the defendants have responded (Docket No. 75), and the plaintiffs have replied (Docket No.78). For the reasons discussed herein, the defendants' summary judgment motion will be granted. The motions regarding the plaintiffs' class action complaint will be denied as moot.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises from a loan agreement between the plaintiffs, Thomas and Juanita Haynes and their daughter, Caroline Page, and the First Union Home Equity Corporation ("First

1

Union"), whose successors in interest, HomeEq Servicing Corporation, Wachovia Corporation, and Wachovia Bank of Delaware, have been named as defendants.[1]   On November 30, 1988, the plaintiffs executed and delivered a "FIXED RATE NOTE" to First Union Home Equity in the principal amount of $42,200.00.  The note stated that the plaintiffs would make a monthly payment by the first of each month and contained the words "Daily Simple Interest" in parentheses at the top.  (Docket No. 50, Pls.' Resp. to Defs.' Mot. for Summ. J., Ex. A.)   The note contained a brief explanation of the way payments would be credited:

> In applying installments under this Note, Note Holder will apply all amounts received first to all interest accrued on the date the payment is credited, then to the unpaid principal balance and then to the other charges, if any, as stated in this Note until the entire indebtedness, evidenced by this Note, is fully paid, except that any remaining indebtedness, if not sooner paid, shall be due and payable on December 1, 2003.
> *Id.*

At the time the Hayneses executed the note, First Union provided them with a Truth In Lending disclosure form.  (Docket No. 31, App. Ex. 2 at p. 2.)  The form, in accordance with the requirements for fixed rate loans, listed the total number of payments and the total debt that would be accrued, provided that all payments were made on time.  According to the form, the Hayneses were to make 180 payments of $520.12 over the course of the loan period.  In four large boxes, the form disclosed the annual percentage rate (12.88%), the total finance charge ($52,265.60), the total amount financed ($41,365.00), and the total payment ($93,621.60).  In addition, the form disclosed that a 5% late charge would be applied to late payments.  However,

---

[1]Unless otherwise noted, the facts have been drawn from the Plaintiffs' Response to the Defendants' Concise Statement of Undisputed Material Facts (Docket No. 49); the Deposition of Caroline Page (Docket No. 41); the Deposition of Juanita Haynes (Docket No. 42); the Deposition of Thomas Haynes (Docket No. 43); the Deposition of P.T. Winterbottom (Docket No. 47, Pls.' Resp. to Defs.' Mot. for Summ J., Ex. B); and the notes and correspondence between the plaintiffs and the defendants (*Id.* at Ex. A, C-I; Docket No. 41, Ex 1-10).

2

it did not disclose the method of calculating interest payments. The only disclosure directly related to that method was the subtitle "Daily Simple Interest" located at the top of the note itself.

During the life of the note, the plaintiffs were charged interest according to the Daily Simple Interest ("DSI") method of calculation. Under that method, interest is calculated on a daily basis and, therefore, late payments can result in interest costs above those contemplated by the original schedule. That is, when payments are made more than thirty days apart, extra interest accrues in the intervening days.[2] Because the plaintiffs' payments were often more than thirty days apart, a significant amount of extra interest accrued. For instance, at some point before the first scheduled payment was due, the plaintiffs requested to push the monthly due dates back to the 15th of each month, and the defendants agreed to the shift. This "payment holiday," in combination with other late payments, created an "interest short."[3] Because the

_____

[2]As a result of this method, and the parties' subsequent agreement, a payment on the tenth of one month, followed by a payment on the fourteenth of the next month, could result in an interest charge above the amount contemplated in the disclosure form, without there having been an actual late payment. However, a payment on the fourteenth of one month, followed by a payment on the tenth of the next month, would result in an interest charge below the amount contemplated on the disclosure form. At the time the TILA disclosures were made, it was not clear that the DSI method would favor either party to the transaction. Moreover, over a long term loan, the thirty day increments must by necessity balance out. For instance, in the scenario outlined above, unless the month in which payment was made on the tenth followed a month in which payment had been made even earlier, the interest accruing for that month would have been less than the interest originally calculated in the agreement. If payment were made on the fourteenth of the next month, it would result in extra interest. But for the next month, payment would have to be made on the fifteenth—the final day for timely payment—for any extra interest to accrue. And subsequently, even if all payments were made as late as possible (while still remaining timely), there would be no extra interest due. The DSI method simply counts in days rather than in months; it does not add or subtract days on which interest can accrue.

[3]That is, the fifteen day "payment holiday" and other late payments created a back log of interest that had not been paid as contemplated in the original schedule.

3

plaintiffs' payments did not cover the back interest, the principal—which itself continued to accrue interest—was not diminished at the expected rate.

Although the words "Daily Simple Interest" were located in parentheses at the top of the note, the plaintiffs did not realize that making late payments would result in additional interest charges above the late fees that also were assessed. As time passed, they did not realize that they were being charged extra interest and that their payments were not being applied against the principal of the loan at the rate contemplated in the loan agreement and the accompanying Truth in Lending disclosure form. The plaintiffs appear not to have known what the term "Daily Simple Interest" meant.

For several years, Thomas and Juanita Haynes received year-end statements indicating how much interest had been paid on the loan. The Hayneses deducted this interest from their taxes without realizing anything was amiss with their payment schedule. Ms. Page, however, alleges to have become aware of discrepancies between the amount of principal which should have been paid off according to the original plan, and the actual rate of payment, by 2001. At some point, Ms. Page asked someone at her place of employment to run an amortization schedule for the loan, for comparison purposes. Later, on November 21, 2000, Ms. Page requested an account of the loan payoff from the defendants, either for the month of December 2000 or January 2001.[4] (*Id.* at 48-49.) Ms. Page compared the amortization schedule with the account provided by the defendants and found that the required payoff was greater than she had expected, with numbers different from those on the amortization schedule.

_____

[4]Ms. Page stated that she had made previous requests to the defendants for an amortization schedule, "possibly" prior to the entire year of 2000, and perhaps as far back as 1999, without receiving one. (Docket No. 41, Page Dep. at 54.)

4

Ms. Page took some actions to discover the source of the discrepancies. She contacted the bank by phone about the inconsistent numbers but could not understand the explanation she was given. Although Ms. Page's testimony is unclear on this point, she appears to have received a letter and an amortization schedule, or some other document, from the defendants as a result of her phone call. She alleges that the document may have been a payoff schedule or a payment history for the life of the loan, rather than an amortization schedule and, moreover, may have been incomplete, depending on which one of those things it was. She could not tell from the information provided why the loan was not being paid off at the rate contemplated in the disclosure statement, but she could tell that something was wrong.

After the passage of the loan's maturity date, December 1, 2003, the defendants took action to notify the plaintiffs that further payments were due. The defendants called the Haynes' family residence several times a day and once sent an emissary to that address with a small note requesting payment. (Docket No. 41, Page Dep. at p. 72-81.) Ms. Page alleges that this conduct caused her mental distress.[5] Thomas and Juanita Haynes testified that they experienced no emotional or other health problems.

On Dec. 17, 2003, in response to another request for an amortization schedule, Mr. P.T. Winterbottom, an employee of the defendants, sent the plaintiffs a letter. The letter explained that their loan was calculated using the DSI method and attached a payment history for the years

_____

[5]Ms. Page's specific testimony is that she first consulted a doctor about restless nights and a return to smoking in "maybe 2002," (Docket No. 41, Page Dep. at p. 81; Docket No. 42, J. Haynes Dep. at 40.) When the defendants' attorney reminded her that the calls didn't begin until after the loan's maturity date in late 2003 and asked if there was another aspect of the loan troubling her, she stated, "Well, the paperwork I had received about the payoff amount being inconsistent with what I thought and my not being able to find anybody that could explain to me why we were [sic] owed the additional money." (Docket No. 41, Page Dep. at 88.)

2000-2003. At some point later, HomEq sent the plaintiffs a letter including a partial account activity statement, describing the "interest short." Ms. Page requested additional loan information on March 4 and 9, 2004. On April 27, 2004, the plaintiffs received a letter explaining the DSI method and the possibility of an "interest short" and including a complete payment history.

On December 1, 2001, when the original schedule contemplated that the loan would be paid off, and after the remission of all late charges and all 180 monthly payments, the defendants' accounts still showed that the plaintiffs owed $2,206.50, due to interest charged for late payments and interest charged during the "payment holiday". If the plaintiffs' payments had been made by the dates set forth in the note, their loan would have been paid off on time—the extra debt was solely related to the "interest short".[6]

On December 6, 2004, the plaintiffs filed this action in this court, alleging (1) failure to make disclosures in violation of the Truth in Lending Act, (2) unfair or deceptive practices in violation of the Tennessee Consumer Protection Act, (3) unconscionability of the underlying loan agreement, (4) negligent misrepresentation, (5) intentional misrepresentation, and (6) failure to enter a deed of release, in violation of TCA § 66-25-102. (Docket No. 1.) On February 1, 2006, the plaintiffs filed a First Amended Class Action Complaint, adding the following claims: (1) making false credit reports in violation of the Fair Credit Reporting Act, (2) libel and slander, and (3) intentional and negligent infliction of emotional distress. The defendants moved for

---

[6]While Mr. Winterbottom's deposition is indeed, as the plaintiffs claim, needlessly and perhaps designedly confusing, the gist of it seems to be that, while the processing date (the date that the payment is credited) may not be the date the payment is received, the interest calculations are based on the "effective date," which is the date the payment was received. (Docket No. 47, Ex.B, Winterbottom Dep. at 38-40.)

6

summary judgment as to those claims on March 29, 2006.

In its response brief, the plaintiffs abandoned all but the following claims: (1) violation of the Truth in Lending Act, (2) intentional and negligent misrepresentation, (3) violation of the Tennessee Consumer Protection Act, (4) unconscionability, and (5) intentional and negligent infliction of emotional distress.   In their Motion for Leave to Amend Plaintiffs' First Amended Class Action Complaint, the plaintiffs have proposed to add a claim for breach of contract.

## ANALYSIS

### I.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000).  Our function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'"  *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

7

If the nonmoving party fails to make a sufficient showing on an essential element of the case—provided that the nonmoving party bears the burden for that element—the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). And we must keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. Finally, "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to an analysis of the plaintiff's claims.

## II. The Truth in Lending Act

The defendants argue that the plaintiffs' Truth in Lending Act ("TILA") claim must be dismissed because (1) it has been brought past the expiration of the statute of limitations, (2) TILA does not create a duty to disclose the method of calculating interest, and (3) in any event, the defendant's disclosures were adequate. Although the statute of limitations, assuming the defendants could show a TILA violation, would be tolled, the court finds that TILA does not

8

require disclosure of the method of calculating interest and, therefore, must dismiss the

plaintiffs' TILA claim.[7]

### A.     Statute of Limitations

TILA has a one year statute of limitations.  15 U.S.C.A.§ 1640(e).  Because any TILA

violation would have to have occurred at the consummation of the loan in 1988—when the

disclosures were made (or not made)—the limitations period would have to have begun at that

---

[7]The court expresses no opinion as to whether the defendants' disclosures would have been adequate under TILA, assuming that TILA had required such disclosures to be made.  In the absence of clear direction from TILA, it is unclear what level of specificity would be required.  *See Smith v. No. 2 Galesburg Crown Fin. Corp.*, 615 F.2d 407, 416, 417 (7th Cir. 1980) (requiring strict adherence to the language in TILA's Regulation Z)*; Gennuso v. Commercial Bank & Trust Co.*,  566 F.2d 437, 443 (3rd Cir. 1977) ("[A]ny misgivings about the technical nature of the requirements under the Act or Regulation should be addressed to Congress and the Federal Reserve Board, not to this Court."); *but see Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555 (1980) ("*Meaningful* disclosure does not mean *more* disclosure. Rather, it describes a balance between competing considerations of complete disclosure...and the need to avoid...[informational overload].") (internal quotations omitted); *Dixon v. D.H. Holmes Co., Ltd.*, 566 F. 2d 571, 571 (5th Cir. 1978) ("The Truth in Lending Act requires truth in lending, but it's not an act that requires sacrament in language.") The Sixth Circuit has allowed for some deviation from Regulation Z. *See Baker v. Sunny Chevrolet, Inc.*, 349 F.3d 862 (6th Cir. 2003). But in the absence of any directive from Regulation Z as to disclosure of the method of calculating interest, it is impossible to say whether listing the title of that method at the top of the note, without further explanation, would qualify as an adequate disclosure.  Although the defendants assert that language stating, "Note Holder will apply all amounts received first to all interest accrued on the date the payment is credited, then to the unpaid principal balance and then to the other charges" explains the DSI method, it simply does not.  Rather, that language explains the allocation of payment between principal and interest, and not the method of calculating the interest.  The subtitle at the top of the note, "Daily Simple Interest," does clearly relate to the method of calculating interest.  However, neither the note nor the disclosure statements provided language explaining what "Daily Simple Interest" is.  The court cannot say whether that subtitle itself would qualify as an adequate disclosure, in the absence of statutory direction.  *See Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555 (1980) ("[Where the] disclosure is not governed by clear expression in the statute or regulation . . . it is appropriate to defer to the Federal Reserve Board and staff in determining what resolution of that issue is implied by the truth-in-lending enactments.")

9

point and expired one year later, in 1999. *Wachtel v. West*, 476 F.2d 1062, 1065 (6th Cir. 1973); *Jones v. TransOhio Sav. Ass'n*, 747 F.2d 1037, 1043 (6th Cir. 1984).

The plaintiffs contend, however, that the statute of limitations must be tolled. According to the plaintiffs, although Ms. Page was aware of discrepancies more than a year before the action was filed, neither she nor her parents received any information regarding the defendants' method of calculating interest on their loan until December 17, 2003. Therefore, the plaintiffs allege that they were not actually put on notice of their TILA claim—based on the defendants' application of the DSI method in calculating interest—until that date. Since the plaintiffs filed their Complaint on December 6, 2004, tolling the statute until they received information on the DSI method would place this action just barely within the statutory period.

The Sixth Circuit has held that TILA is subject to equitable tolling. *Jones*, 747 F.2d at 1041. Other circuits also have found TILA's statute of limitations subject to tolling. *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.23d 703, 706 (11th Cir. 1998) (citing cases where equitable tolling was applied). In the 6th Circuit, when the statute is tolled by fraudulent concealment, the limitations period begins to run "when the borrower discovers or had reasonable opportunity to discover the fraud involving the complained of TILA violation." *Jones*, 747 F.2d at 1041. The *Jones* court held that TILA "is subject to equitable tolling in appropriate circumstances, and that for the application of the doctrine of fraudulent concealment, the limitations period runs from the date on which the borrower discovers or had reasonable opportunity to discover the fraud." *Id.* at 1043.

In *Gray v. Home Bank of Tennessee*, 1995 WL 35660 (6th Cir. 1995), the Sixth Circuit did not find that tolling was appropriate under the doctrine of fraudulent concealment. In *Gray*,

10

the plaintiffs alleged that the defendant had concealed certain documents and reports and engaged in delaying tactics, but the court found that, because the plaintiffs had signed documents in blank, they were aware that they had not received all disclosures as of the time of signing. *Id.* at *1. For the doctrine of fraudulent concealment to apply in a context outside of TILA, the 6th Circuit has required that (1) the defendant conceal the cause of action, (2) the plaintiff be unable to discover it due to the concealment, and (3) that the plaintiff exercise due diligence. *Pinney Dock and Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1465 (6th Cir. 1988). The 6th Circuit noted that actions based on fraud, or in which a fraud was self-concealing, did not require further fraudulent acts. *Id.* at 1469. Because there was no duty to disclose the information at issue (see infra), tolling must be based either on the plaintiffs' inability to discover their cause of action, despite their diligence, or on the self-concealing nature of the defendants' fraudulent disclosures.

TILA, as a remedial statute, is to be construed broadly. *Jones*, 747 F.2d at 1040. The purpose of TILA is "to protect the consumer from divergent and at times fraudulent practices stemming from the uni[n]formed use of credit." *Jones*, 747 F.2d at 1040. If the statute were not tolled by the inability of claimants to discover their cause of action, the outcome would be the "anomalous result that a statute designed to remediate the effects of fraud would instead reward those perpetrators who concealed their fraud long enough to time-bar their victims' remedy." *Ellis*, 160 F.3d at 708. Furthermore, the *Jones* court specified that the statute would run "when the borrower discovers or had reasonable opportunity to discover the fraud involving the complained of TILA violation." 747 F.2d at 1041. There is at least a genuine issue of material fact regarding whether the plaintiffs, in fact, had such an opportunity and did not pursue it diligently or were denied the opportunity by the defendants' non-disclosure and failure to

11

provide detailed account information. Therefore, the court finds that the possibility of equitable tolling survives summary judgment.

Because the plaintiffs were not on notice of the violation until they obtained further information regarding the method of calculating interest and discovered the possibility that the defendants had not adequately disclosed this methodology, their suit was timely. Until the December 17, 2003 letter, the plaintiffs did not understand the payoff discrepancies or discover the alleged fraud: that the interest on their loan was being calculated using the DSI, rather than the actuarial, method as they expected. (Docket No. 41, Page Dep. at 63; Docket No. 41, Ex. 8.) Whether the plaintiffs had a reasonable opportunity to discover that the method of calculating interest on their loan may have been inadequately disclosed, and different from the method they expected, is a question of fact.

The plaintiffs were aware of discrepancies between the payoff they expected and that which the bank expected when they received the payoff statement that they had requested on November 21, 2000. The plaintiffs also were habitually deducting the interest they paid yearly on their tax returns. Ms. Page alleges to have experienced a nervous condition due to the discrepancies in 2002, which might imply some notice of the cause of action at that time. (Docket No. 41, Page Dep. at 81; Docket No. 42, J. Haynes Dep. at 40.)

However, the plaintiffs have made an adequate showing that they did not know the precise source of the problem and, despite reasonable efforts, could not discover that source. For instance, Ms. Page called the lender's 800 number but was unable to understand the representative. (*Id.* at 52-54, 63.) The plaintiffs never received a schedule showing interest charged and the way in which payments were applied until April 27, 2004, and presumably had

12

no notice that the DSI method was in use until the Dec. 17, 2003 letter. (Docket No. 50, Ex. E, Apr. 27 Letter; Docket No. 50, Ex. I, Dec. 17 Letter.) Moreover, the plaintiffs have alleged that the defendants failed to respond to their repeated requests for information about how their loan payments were being applied. (Docket No. 41, Page Dep. at 54.) Drawing reasonable inferences in favor of the plaintiffs, there is at least a genuine issue of material fact regarding the tolling of the statute that precludes summary judgment.

### B.    The Defendants' Duty to Disclose

The defendants argue that TILA did not create a duty to disclose that the DSI method would be used to calculate interest. Because neither TILA nor its enacting regulations contain any language requiring such a disclosure, the court finds the defendants' arguments persuasive and, on that basis, grants summary judgment to the defendants on the plaintiff's TILA claim.

Liability under TILA is predicated on a duty under that statute to make disclosures; however, TILA and its supporting regulations contain no language requiring disclosure of the method for calculating interest for closed end transactions. Therefore, the plaintiffs have no valid TILA claim. Because the defendants' choice of method would not have made a difference to the plaintiffs' overall payout on the loan had the plaintiffs not (1) requested a payment extension at the inception of the loan, and (2) made late payments throughout the loan, the absence of any such requirement is not surprising. The purpose of TILA is to allow customers to make informed decisions based on the cost of credit. *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 163 F.3d 948 (6th Cir. 1999). In closed-end transactions, that cost can be determined in advance, so long as the parties adhere to a specific payment schedule. Where the borrower does not adhere to the schedule set forth in the TILA disclosure form, however, it has eliminated a

13

reasonable expectation in the accuracy of that schedule. *See* 12 C.F.R. § 226 (Supp. I ¶ 17(c)(2)(i)(3)) ("On the other hand, creditors may choose not to label disclosures as estimates and may base all disclosures on the assumption that payments will be made on time, disregarding any possible inaccuracies resulting from consumers' payment patterns.")

### 1.    No Explicit Statutory Duty

Section 15 U.S.C.A. § 1638 enumerates the required disclosures for closed end credit transactions such as the one at issue.[8]  The statute has a list of fifteen items a creditor must disclose, including the identity of the creditor, the amount financed, the finance charge, the finance charge expressed as an annual percentage rate, the total of payments, the number, amount, and due dates of payments, and descriptive explanations of the terms "amount financed," "finance charge," "annual percentage rate," "total of payments," and "total sale price." 15 U.S.C.A. § 1638(a) (Westlaw current through June 15, 2006).  The method of calculating the interest is conspicuously absent from these required disclosures.

The defendants' method of computing interest, DSI, is contemplated by the statute. TILA explicitly expects that interest will be figured either as precomputed installments or based on the lapse of days between payments (DSI) by requiring "[a] statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge" or "[a] statement indicating whether or not a penalty will be imposed in those same

---

[8]"An open end credit plan is one in which credit terms are initially established with the opening of the account, but no fixed amount of debt is incurred at that time . . . . In close[d] end transactions the finance charge is divided into the term of the loan and incorporated into the time payments and thus the rate is computable by the consumer from the time he receives his first billing." *Goldman v. First Nat. Bank of Chicago,* 532 F.2d 10, 17 (7th Cir. 1976).

circumstances if the obligation involves a finance charge computed from time to time by application of a rate to the unpaid principal balance." 15 U.S.C.A. §1638(a)(11). The defendants complied with this requirement by including a statement that no penalty would be imposed for prepayment, indicating their understanding that the loan was indeed a simple interest loan computed from date of payment to date of payment.

The definitions section of TILA includes the term "material disclosures," which is defined as "the disclosures, as required by this subchapter, of the annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of payments, the due dates or periods of payments scheduled to repay the indebtedness, and the disclosures required by section 1639(a) of this title." *Id*. §1602(u) (emphasis added). Failure to make material disclosures triggers the consumer's right of rescission under § 1635(a) and opens up the creditor to liability for damages. § 1635(a); § 1640(a). The requirement to disclose the "method of determining the finance charge" is not further explained, but TILA also contains a section entitled "Determination of finance charge," which requires determining the finance charge as "the sum of all charges, payable directly or indirectly" by the borrower or imposed by the creditor "as an incident to the extension of credit." § 1605(a). The section goes on to include and exclude certain charges in the calculation of the finance charge. *Id.* Because TILA has a section devoted to the determination of the finance charge, and because this section tells how the finance charge should be determined, the phrase "method of determining the finance charge" appears to refer not to the method of calculating interest, but to the method of determining, at the front end, the sum total of finance

15

charges, including interest and other fees that the borrower is liable to incur.

Regulation Z enumerates what disclosures are required by TILA, as well as other statutory requirements. Specifically, Regulation Z requires disclosure of the finance charge, that is, the total amount the credit will cost, the Annual Percentage Rate, and the cost of credit on a yearly basis. 12 C.F.R. § 226.18(d)-(e). The method of calculating the interest is addressed in a section entitled "Determination of annual percentage rate." *Id.* § 226.22. Regulation Z requires that "[t]he annual percentage rate shall be determined in accordance with either the actuarial method or the United States Rule method." *Id.* § 226.22(a)(1). The actuarial method is described as the method under which "at the end of each unit-period (or fractional unit-period) the unpaid balance of the amount financed is increased by the finance charge earned during that period and is decreased by the total payment (if any) made at the end of that period." *Id.* § 226, Appendix J (a)(2). Appendix J describes the actuarial method in detail, and allows for unit-periods ranging from one day to one year. *Id.* § 226, Appendix J (b). The actuarial method is contrasted with the U.S. Rule method, in which, "at the end of each payment period [as opposed to unit-period], the unpaid balance of the amount financed is increased by the finance charge earned during that payment period [as opposed to unit-period] and is decreased by the payment made at the end of that payment period [as opposed to unit-period]. If the payment is less than the finance charge earned, the adjustment of the unpaid balance of the amount financed is postponed until the end of the next payment period." *Id.* at (a)(3).[9] Notably, Regulation Z requires that creditors use one of

---

[9]The essential difference seems to be that the U.S. Rule does not add the interest to the principal amount if the payment is less than the interest. The Official Commentary on the U.S. Rule explicates the methodology: "The U.S. Rule produces no compounding of interest in that any unpaid accrued interest is accumulated separately and is not added to principal. In addition, under the U.S. Rule, no interest calculation is made until a payment is received." 12 C.F.R. § 226

16

these two methods: it does not specify which one must be used, and it does not require disclosure of the method in closed-end transactions, such as the transaction in this case.

A previous embodiment of Regulation Z § 226.8 did require the disclosure of the method of calculating interest on unearned finance charges on prepaid or accelerated loans. However, that requirement does not apply to this case. Under that now-deleted section, creditors were required to disclose any unearned portion of the finance charge in the event of default, prepayment, or delinquency (which did not include late payments). *See, e.g., Martinez v. Idaho First Nat'l Bank*, 509 F. Supp. 773 (D. Idaho 1981) (overruled on other grounds); *Ballew v. Assocs. Fin. Serv. Co. of Nebraska, Inc.*, 450 F. Supp. 253 (D. Neb. 1976). Congress has since amended TILA to exclude that requirement. *Channell v. Citicorp Nat'l Servs., Inc*. 89 F.3d 379, 383 (7th Cir. 1996). Congress' actions, first in enumerating a specific category of situations where disclosure of the method of calculating interest would apply, and second in deleting that category, give rise to a strong argument against a finding that TILA requires such disclosure in all cases. Instead, it is clear that Congress, first, intended that the requirement apply in only a small number of situations—none of which are involved in the case at hand—and, second, intended that the requirement not apply under any circumstances.[10]

_____

(Supp. I, ¶ 22(a)(1)). Thus the plaintiffs and defendants do not disagree about whether the U.S. or actuarial method will be used to compute interest. Their disagreement is either about whether interest payments were precomputed as opposed to simple interest or about the length of the unit-period for the loan. The Official Commentary identifies the U.S. Rule as the method in which no calculation is made until the payment is received; this is how the plaintiffs' interest was calculated. 12 C.F.R. § 226 (Supp. I, ¶ 22(a)(1)); (Docket No. 49, Pls.' Resp. to the Concise Statement of Undisputed Material Facts at ¶ 7).

[10]In addition, the scarcity of case law addressing the lender's duty to disclose the methodology of computing interest is probably itself an indication of an absence of duty. In *Cardiello v. The Money Store*, 2001 WL 604007 (S.D.N.Y. 2001), one of the few reported cases,

The plaintiffs have pointed the court to no language under TILA creating a duty to disclose the method of calculating interest. The plaintiffs instead argue that TILA must create an implicit duty—"[o]therwise, the law would simply be that a lender could unilaterally decide the manner in which interest was calculated on a loan." (*Id.* at 19.) However, that is, in fact, the regime created by Congress. As discussed above, Regulation Z specifies just two ways in which lenders can calculate interest, of which the DSI method is one, and does not require the disclosure of the method. 12 C.F.R. § 226.22(a)(1). At one time, Regulation Z required such disclosures only in an unrelated circumstance, but it has since been amended to exclude that requirement. The silence of Regulation Z on this issue indicates that the lender has no duty to disclose the method of calculating interest, provided that it chooses one of the two specified methods. *See Ford Motor Credit Co*, 444 U.S. at 566 (holding that, in a TILA case, "judges are not accredited to supersede Congress or the appropriate agency by embellishing upon the regulatory scheme").[11]

_____

the court dismissed the action on statute of limitations grounds and did not reach the merits of the plaintiffs' argument that undisclosed interest was charged on their loan. *Id.* at *5. The loan agreement stated that late payments would increase the finance charge, but the plaintiffs were apparently not aware that theirs was a daily simple interest loan, until Mr. P.T. Winterbottom informed them. *Id.* at *1-2. In that case, the defendant had changed its methodology of calculating interest to one more favorable to borrowers after a settlement with the FTC. *Id.* at *2. The court did not discuss the adequacy of the disclosures or unilateral decision to change the methodology of calculating interest.

[11]The plaintiffs have not argued that, under TILA, the defendants had a duty to disclose that they would be subject to additional interest charges when the parties agreed to the initial fifteen-day payment extension, and for good reason. Because TILA concerns only a lender's duty to make initial disclosures, it does not govern the situation where the parties agree to amend the terms of an agreement after the disclosures have been made. Whether the defendants owed a duty to disclose to the plaintiffs that the "payment holiday" arrangement would create extra interest charges is perhaps relevant to their state law causes of action, but it does not affect the accuracy of the original TILA disclosures.

18

### 2. Whether the Method of Calculating Interest is Included in the Term "Finance Charge."

At first glance, it may appear that the method of calculating interest could be included in the category of "finance charges" for which TILA requires disclosure. However, while the term "finance charge" clearly includes interest costs, it typically only includes costs that can be calculated at the front end of a transaction, whereas the difference between the two different methods of calculating interest can only be known after the parties have made payments. In fact, case law interpreting the term "finance charge" under TILA has held that the term includes only the expected cost of credit at the time the parties enter into the loan agreement. *See Vega v. First Fed. Sav. & Loan Ass'n of Detroit*, 622 F. 2d 918 (6th Cir. 1980) ("The basis of the distinction between a finance charge and a late payment charge is that one represents an actual unavoidable charge while the other one simply represents a potential charge.")

TILA mandates that the finance charge "shall be determined as the sum of all charges, payable directly or indirectly by the person to whom credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C.A. § 1605(a). A number of charges, including interest, are explicitly included in the finance charge. *Id.* § 1605(a)(1). Regulation Z reiterates TILA's definition, adding that the charge must be "incident to or as a condition of" extending credit. 12 C.F. R. § 226.4(a). Excluded from the finance charge is "any charge of a type payable in a comparable cash transaction" *Id.* Regulation Z also lists numerous examples of charges which are included in the finance charge (interest, service charges, loan fees, insurance, etc.) and charges which are excluded (credit application fees, late payment charges, real-estate related fees, etc.) 12 C.F. R. § 226.4(b)-(c).

In general, amounts included in the term "finance charge" can be determined at the time

the loan is executed; they are not contingent.  For instance, courts have found that prepaid finance charges are part of the finance charge, although they are also required to be disclosed in an itemization of the amount financed.  12 C.F.R. § 226.18(c)(1)(iv).  Unlike interest, a prepaid finance charge is the same regardless of the life of the loan:  "As a one-time expense due at the outset, the loan fee is different from a typical add-on charge which may later be recovered if not earned or expended with the passage of time over the life of the transaction. The necessity to make this difference plain to the borrower is precisely why Regulation Z requires that the customer be told that this segment of the finance charge is prepaid." *Jones v. Cmty. Loan & Inv. Corp. of Fulton County*, 526 F.2d 642, 648 (5th Cir. 1976).

The court in *Jones v. Cmty. Loan* found that certain loan fees were prepaid, even though the borrower was allowed to repay them over the life of the loan, because they were "fully earned" at consummation. *Id.* at 643. The court also considered the effect of disclosures on the consumer when it concluded that showing the loan fees as part of the finance charge without disclosing that they were prepaid would be misleading because, unlike interest, they are not recoverable in the event of early repayment. *Id.* at 648.  The court in *In re Hill*, 213 B.R. 934, 937 (Bankr..D. Md. 1996) found a TILA violation because a prepaid finance charge for interim interest that had accumulated between the loan's consummation and the first payment's due date was not subtracted from the amount financed, resulting in interest being charged on this finance charge.  *Id.* at 939-40. *See also Ljepava v. M. L. S. C. Properties, Inc.*, 511 F.2d 935, 941 (9th Cir. 1975) (holding that "in those cases in which prepaid finance charges are paid in cash they should be deducted from the amount of the loan in order to determine the amount financed for purposes

of disclosure").[12]

By way of contrast, courts have excluded fees from the term "finance charge" that could not be anticipated, often by referring directly to the statutory terms, Regulation Z and the Federal Reserve Board's opinions. For instance, in *Hill*, courier fees, which were not required by the lender and of which the lender kept no part, were not part of the finance charge. *In re Hill*, 213 B.R. at 940; *see also April v. Union Mortg. Co., Inc.*, 709 F. Supp. 809, 813 (N.D. Ill. 1989) (where the lender had sold a commercial paper for less than its face value, the profit it made was not a "discount," which is part of the finance charge under TILA). Overdraft fees have also been excluded from finance charges. *Taylor v. Union Planters Bank of S. Mississippi*, 964 F. Supp. 1120, 1123 -1124 (S.D. Miss. 1997); *Sims v. Union Planters Bank of N.E. Mississippi, N.A.*, 1997 WL 170309, *2 (N.D. Miss. 1997) (finding that a daily $5 overdraft charge was not a finance charge because it was excluded by Regulation Z); *Nicolas v. Deposit Guar. Nat'l Bank*, 182 F.R.D. 226, 230 (S.D. Miss. 1998) (holding that an overdraft charge computed by applying

---

[12]Other charges that have been held to be included in the term "finance charge" could all be anticipated at the time the parties entered into the agreement. For instance, in *Hill*, where the lender required the services of a broker in order for the transaction to take place, the broker's fee was subject to disclosure as part of the finance charge based on Regulation Z's classification of required charges. *In re Hill*, 213 B.R. at 940. Similarly, in *Ljepava*, a required commission paid to a financial company, interest, and an "extra payment of $200" were found to be finance charges and required disclosures. *Ljepava*, 511 F.2d at 938; *see also* in *In re Fryer*, 183 B.R. at 328 (failure to include in the finance charge a service charge (part of the finance charge in Regulation Z) and a $13 charge for the cost of recording a deed was found to be a TILA violation). In *Hook v. Baker*, 352 F. Supp. 2d 839 (S.D. Ohio 2004), a document preparation fee that was not disclosed and that was charged only to credit customers rendered the finance charge, total payments, and APR inaccurate. *Id.* at 845. The court found that the plaintiff had shown a connection between the higher price and the extension of credit, in violation of Regulation Z. *Id.* at 844. Yield spread premiums were also found to be finance charges, because they were paid indirectly by the borrower. *In re Mourer*, 309 B.R. 502, 505 (W.D. Mich. 2004); *Noel v. Fleet Finance, Inc.*, 971 F. Supp. 1102, 1111 (E.D. Mich. 1997).

21

interest is not a finance charge and also that a fee for insufficient funds was not part of the finance charge, because the fee, "by express design, has nothing to do with a financing agreement").

The Sixth Circuit has specifically excluded late payments from the finance charge. In *Vega v. First Fed. Sav. & Loan Ass'n of Detroit*, 622 F. 2d 918, 22 (6th Cir. 1980), the lender disclosed that a late payment charge of 4% of the payment would be imposed if the borrower was more than 15 days late, but did not include this as part of the finance charge. The court held that this charge was a charge for an unanticipated late payment and not a finance charge. *Id.* The court concluded: "If the finance charge contained in a disclosure statement reflected both the actual finance charge and a potential charge such as the one in this case, a consumer would not be informed of the amount that he was required to pay....The basis of the distinction between a finance charge and a late payment charge is that one represents an actual unavoidable charge while the other one simply represents a potential charge." *Id.* at 922-23. *See also Bright v. Ball Mem'l Hosp. Ass'n*, 616 F.2d 328, 337 (7th Cir. 1980) ("The fact that a business may expect to have delinquent accounts and anticipate the possible receipt of some revenues from the charges imposed on such accounts does not automatically render such charges 'finance charges.'")

In *Household Credit Servs. Inc. v. Pfennig*, 541 U.S. 232, 242-43 (2004), the Supreme Court held that over-limit fees for credit cards were a penalty and not a part of the finance charge. The Court reasoned that including such contingent fees in the finance charge would be "unworkable to creditors and, more importantly, lead to significant confusion for consumers." *Id.* at 244. The Court based its decision on the specific exclusion of over-limit fees from the finance charge in Regulation Z, *id.* at 241-42, giving the Board's interpretation the heightened deference

22

called for by *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555 (1980): "unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive." *Id.* at 565. Regulation Z excludes "[c]harges for actual, unanticipated late payment" from the finance charge in the same sentence in which it excludes over-limit fees. 12 C.F. R. § 226.4(c)(2). The Court in *Pfennig* further found that, "[a]lthough the fees excluded from the term 'finance charge' in Regulation Z (*e.g.*, application charges, late payment charges, and over-limit fees) might be relevant to a consumer's credit decision, the Board rationally concluded that these fees—which are not automatically recurring or are imposed only when a consumer defaults on a credit agreement—are less relevant to determining the true cost of credit." *Pfennig*, 541 U.S. at 24.

In the case at hand, the interest charges originally contemplated in the disclosure form were part of the finance charge; that is, it was crucial for both parties in determining whether to enter into the agreement. But the use of the DSI method was not, for the simple fact that it would have made no difference to the interest charges, had the parties adhered to the original payment schedule. The extra interest was not earned at the consummation of the loan and, in fact, would not have been charged under the original schedule of payments. Of the available examples, the extra interest may be most analogous to overdraft fees, and not the sort of "pre-paid" fees which courts typically bring under the umbrella of finance charges. Requiring disclosure of the method of interest, where it has no effect on most transactions, could easily "lead to significant confusion for consumers." *Id.* at 244. Therefore the court finds that it is not included in the term "finance charge."

### 3.    Plaintiffs' Argument that the Disclosures Were Inaccurate

The plaintiffs allege that the defendants' use of the DSI method rendered its other disclosures inaccurate. Regulation Z provides that, if "a disclosure becomes inaccurate because of an event that occurs after the creditor delivers the required disclosures, the inaccuracy is not a violation of this regulation." 12 C.F.R. § 226.17(e). The defendants' use of DSI did not, in itself, render its disclosure form inaccurate. It was the DSI method, in combination with the plaintiffs' deviance from the payment schedule, that accomplished that goal. Moreover, TILA and Regulation Z "do not purport to require any disclosure whenever the cost of credit is increased by reason of the failure to pay an installment of a loan when it is due." *Fisher v. Beneficial Fin. Co. of Hoxise*, 383 F. Supp. 895, 898. Instead, a creditor in a simple interest loan "may base all disclosures on the assumption that payments will be made on time, disregarding any possible inaccuracies resulting from consumers' payment patterns." 12 C.F.R. § 226 (Supp. I ¶ 17(c)(2)(i)(3)).

In fact, several courts have held that the method of calculating interest can be altered during the term of the loan. In *Lipson v. Burlington Sav. Bank*, 428 F. Supp. 1073 (D. Vt. 1977), the defendant changed the calculation of interest from a monthly to a daily basis during the loan period. The original note had stated: "[t]he interest shall be computed upon the unpaid balance and shall be payable on the first day of each and every month and is included in the payments above specified. The same interest rate shall apply after default" *Id.* at 1076. The bank then sent the borrowers a letter informing them that interest would be calculated for each day a payment was late. *Id.* The court held that, even if the defendant had not disclosed that the same rate of interest would apply after default, "the defendant's change in practice would not appear to violate the requirements of the Act and Regulation Z....The defendant's decision to begin

24

charging interest at the contract rate on a daily basis does not penalize late payment, but merely accounts precisely for the amount of time which the borrower takes to repay his obligation." *Id.* at 1078. Because a TILA violation occurs at consummation, *Begala*, 163 F.3d at 951, inadequate initial disclosures would have constituted a violation of TILA, unless a subsequent agreement or occurrence altered them; however, the court found no violation. The court further found that the change in methodology did not change the "number, amount and due dates of the schedule payment." *Id.*

Although the interest charged to the plaintiffs was part of the finance charge, the defendants were not required to anticipate in their disclosure the possibility that the charges would vary with payment dates in a simple interest loan. 12 C.F.R. § 226 (Supp. I ¶ 17(c)(2)(i)(3)). Absent a duty to disclose the method of calculating interest, the disclosure of the finance charge was accurate.

### 4. The Purpose of TILA

The court's holding that TILA does not require disclosure of the method of calculating interest is also in accordance with the purpose of that statute. According to the Supreme Court in *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555 (1980), "*Meaningful* disclosure does not mean *more* disclosure. Rather, it describes a balance between 'competing considerations of complete disclosure...and the need to avoid...[informational overload]'" (citation omitted). TILA's purpose, according to the statute itself, is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C.A. § 1601(a).

TILA provides for statutory damages only for a failure to disclose certain items, including the amount financed, finance charge, APR, and total of payments. 15 U.S.C.A. § 1640(a). The Sixth Circuit, in particular, has been wary to find extra requirements outside the scope of the statutory language. For instance, in *Baker v. Sunny Chevrolet, Inc.*, 349 F.3d 862 (6th Cir. 2003), the Court found no liability under 15 U.S.C.A. § 1640(a) for untimely delivery of disclosures, allowing only the recovery of actual damages. *Id.* at 869. The court based its opinion on the exclusion of the sections of TILA concerned with the timeliness of disclosures from statutory damages allowed by § 1640. *Id.* at 867-68.

In *Ford Motor Credit Co. v. Cenance*, 452 U.S. 155, 159 (1981), the Supreme Court found that notification that a contract was being assigned alerted the borrower that the assignee would be a creditor, and that no separate disclosure of creditor status was necessary: "Here, requiring more disclosure would not meaningfully benefit the consumer and consequently would not serve the purposes of the Act." *Id.* at 159. Similarly, in *Williams v. Western Pac. Fin. Corp.*, 643 F.2d 331 (1981), 338 (5th Cir. 1981), the Fifth Circuit held that the adequacy of disclosures "must be assessed, at least in part, by the audience for which disclosure was intended," finding that the terms of the agreement must be examined in context to see whether they were misleading. While the "technical requirements" of the Act demand strict compliance, the court held that, "in determining whether a particular disclosure is clear or confusing..., we must be guided by probabilities rather than mere possibilities." *Id.* at 339. While the disclosure statement did have superfluous and ambiguous terms, the court concluded that the terms, in context, did not mislead the consumer. *Id.* at 339. *See also Gambardella v. G. Fox & Co.*, 716 F. 2d 104, 110 (2d Cir. 1983) ("[T]he 'meaningful' disclosure TILA requires [citation omitted] should not be

26

equated with complete disclosure of all credit terms of potential use to consumers.")

TILA does not require disclosure of all conceivable charges or risks, but rather requires that the debtor be informed how much the debt will cost her, based on certain assumptions, often including a payment schedule. Its purpose is not served by requiring lenders to make disclosures, such as the one at issue, that will make no difference in the overall cost of credit in most situations. Neither the statutory language, the accompanying Regulation Z, nor any interpretive case law can be marshaled in favor of a duty to disclose the DSI method under TILA. In fact, each of those sources indicate that, provided the creditor employs one of two acceptable methods, it need make no such disclosure. Accordingly, the court must dismiss the plaintiff's TILA cause of action.

## II.     State Law Claims

Because the plaintiffs assert federal question jurisdiction under 28 U.S.C. § 1331, the court loses original jurisdiction over the plaintiffs' state law claims upon dismissal of its sole federal cause of action: the TILA claim. The only remaining basis for keeping those claims is supplemental jurisdiction. District courts generally have broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims. *See Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996) (citing *Transcon. Leasing, Inc. v. Michigan Nat'l Bank of Detroit*, 738 F.2d 163, 166 (6th Cir. 1984)), *amended by, reh'g en banc denied*, 1998 U.S. App. LEXIS 1626 (6th Cir. Jan. 15, 1998).

Under 28 U.S.C. § 1367(c)(3), a federal district court may decline to exercise supplemental jurisdiction over a plaintiff's pendant state law claims—here, plaintiffs' claims under Tennessee law—if the court has dismissed all claims over which it has original

jurisdiction. Section 1367(c)(3) codifies the approach first taken by the Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966), and refined by the Court in *Rosado v. Wyman*, 397 U.S. 397, 405 (1970), and mandates that "there is no categorical rule that the pretrial dismissal of a federal claim bars a court from deciding remaining state law claims" but that the decision depends on "'judicial economy, convenience, fairness, and comity.'" *Musson Theatrical*, 89 F.3d at 1254 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

In *Musson Theatrical*, the Sixth Circuit held that "it was an abuse of discretion" for the trial court to "retain the state law claims on a theory of supplemental jurisdiction after dismissal of the federal claims upon which supplemental jurisdiction depended," where the federal claims had been dismissed before trial. *Id.* The court reasoned that, although a district court has "broad discretion" to exercise supplemental jurisdiction, that discretion "is bounded by constitutional and prudential limits on the use of federal judicial power" and that one of the central limits, handed down by *Gibbs*, was that, "'if the federal claims are dismissed before trial, even though [the federal claims are] not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.'" *Id.*, quoting *Gibbs*, 383 U.S. at 726. The court noted that, under *Rosado*, that limit is not absolute; instead "a district court may (rather than must) decline to exercise jurisdiction" after having dismissed all federal claims, *Id.* (internal quotations omitted); however, "[a]s a rule of thumb . . . the *Gibbs* dictum remains valid," and therefore "the balance of considerations usually will point to dismissing state law claims" where no federal cause of action remains. *Id.* at 1254-55; *see also Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991) (holding that only "overwhelming interests in judicial economy may allow a

28

district court to properly exercise its discretion and decide a pendent state claim even if the federal claim has been dismissed before trial").

In this case, no overwhelming interests weigh in favor of retaining the remaining claims. The pendant state law claims are all torts arising either under Tennessee common law or Tennessee statutory authority. As a matter of comity, those claims belong in Tennessee state courts. Moreover, there are no pressing reasons relating to judicial economy, convenience, or fairness compelling this court to retain jurisdiction. *See, e.g., Barbee v. Wal-Mart Stores, Inc.*, No. 01-2228 GBRE, 2002 WL 1784318 (W.D. Tenn. Jul. 16, 2002) (dismissing pendant state law claims "[a]s a matter of comity and respect for Tennessee courts' interest in ruling on matters of state law"); *Wynn v. Morgan*, 861 F.Supp. 622, 637 (E.D. Tenn.) (declining to exercise supplemental jurisdiction over state law claims after granting summary judgment on the underlying § 1983 claim). Accordingly, the plaintiffs' state law claims must be dismissed.

## CONCLUSION

For the reasons stated herein, the defendants' Motion for Summary Judgment will be granted. All other motions will be denied as moot, and this case will be dismissed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

29